_____

No. 95-2608
_____

Thomas D. Carver,                      *
                                       *
                    Appellant,  *
                                       *
     v.                                *  Appeal from the United States
                                       *  District Court for the
Jeremiah W. Nixon, Attorney            *  Western District of Missouri.
General, State of Missouri;            *
John Maupin, Chair, Missouri           *
Ethics Commission,                     *
                                       *
                    Appellees.  *


_____

            Submitted:  September 13, 1995

              Filed:  December 19, 1995
_____

Before BOWMAN, ROSS and JOHN R. GIBSON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.


     The campaign contribution limits in Proposition A, Mo. Ann. Stat.
§ 130.100 (Vernon Supp. 1995), adopted by initiative, were declared
constitutional by the district court, which refused to enjoin their
implementation.  Carver v. Nixon, 882 F. Supp. 901 (W.D. Mo. 1995).  Thomas
D. Carver appeals, arguing that the district court erred in ruling that the
Proposition A contribution limits for state and local candidates did not
violate a contributor's freedoms of speech and association under the First
Amendment.  We conclude that section 130.100 is unconstitutional and
reverse the judgment of the district court.

In the spring of 1994, the Missouri General Assembly passed Senate Bill 650, adopting campaign contribution limits to become effective January 1, 1995. See Mo. Rev. Stat. § 130.032 (1994). Voters approved Proposition A at the November 8, 1994 election. Proposition A adopted lower contribution limits and became effective immediately.[1]

_____

[1]Proposition A provides:

There shall be the following limitations on campaign contributions:

(1)    No person or committee shall make a contribution to any one candidate or candidate committee with an aggregate value in excess of:
       (a)    $100 per election cycle per candidate in districts with fewer than 100,000 residents[.]
                     (2)    [sic] $200 per election cycle per candidate, other than statewide candidates, in districts of 100,000 or more residents. For purposes of this section "statewide candidates" refers to those candidates seeking election to the office of Governor, Lieutenant Governor, Attorney General, Auditor, Treasurer and Secretary of State.
       (3)    [sic] $300 per election cycle per statewide candidate.
(2)    No person, entity or committee shall make a contribution to any other persons, entities or committees for the purpose of contributing to a specific candidate which when added together with contributions made directly to the candidate or to the candidate's committee, will have an aggregate value in excess of the limits stated in section 1.
(3)    No candidate or candidate committee shall solicit or accept any contribution with an aggregate value in excess of the limits stated in this section.
(4)    For purposes of this section the term "candidate" shall include the candidate, the candidate's

-2-

treasurer, and the candidate's committee and any contribution to the candidate's treasurer or candidate committee shall be deemed a contribution to the candidate.

Mo. Ann. Stat. § 130.100.

The Missouri Attorney General issued an opinion stating that, although both Proposition A and Senate Bill 650 "concern campaign finance, they are not irreconcilably inconsistent." Missouri Ethics Commission, Op. Atty. Gen. No. 218-94 (Dec. 6, 1994), at 4. The Attorney General stated that the two provisions stand together in regulating campaign finance, and to the extent there is a conflict between specific provisions of the statutes, the more restrictive provision prevails. Id. Thus, the lower campaign contribution limits of Proposition A control.[2]

The contribution limits in Proposition A are limits "per election cycle per candidate."[3] Mo. Ann. Stat. § 130.100. The statute provides that no person or committee shall make a contribution to any one candidate or candidate committee with an aggregate value in excess of: (a) $100 for candidates in districts with fewer than 100,000 residents; (b) $200 for other than statewide candidates in districts of 100,000 or more residents; and (c) $300 for statewide candidates. Mo. Ann. Stat. § 130.100. Governor, Lieutenant Governor, Attorney General, Auditor, Treasurer, and Secretary of State are enumerated as statewide candidates for purposes of the section. Mo. Ann. Stat. § 130.100(2) [sic].

Senate Bill 650 imposed limits for each election. Thus, on an election cycle basis, the Senate Bill 650 limits are twice the amount enumerated in the text of Senate Bill 650. See Mo. Rev. Stat. § 130.032.1. Contributions are limited to $1,000 per

---

[2]Other provisions of Senate Bill 650 and Proposition A were the subject of litigation in Shrink Missouri Government PAC v. Maupin, 892 F. Supp. 1246 (E.D. Mo. 1995). We heard the appeal in that case on the same day as this appeal. See Shrink Mo. Gov't PAC v. Maupin, No. 95-2857, slip op. (8th Cir. Dec. 19, 1995).

[3]An election cycle is "the period of time from general election for an office until the next general election for the same office." Mo. Stat. Ann. § 130.011 (Vernon Supp. 1995). Thus, an election cycle includes the primary and general election.

-4-

election for Governor and other statewide offices, as well as for candidates in districts with a population of at least 250,000. Mo. Rev. Stat. §§ 130.032.1(1), (6). There is a $500 per election contribution limit for candidates for State Senate, and for any office in electoral districts with a population between 100,000 and 250,000. Mo. Rev. Stat. §§ 130.032.1(2), (5). Contributions are limited to $250 per election for candidates for State Representative and for offices in districts of a population less than 100,000. Mo. Rev. Stat. §§ 130.032.1(3), (4).

Carver brought this action to enjoin enforcement of Proposition A. He asserted that Proposition A restricted his ability to make contributions in violation of his rights of free speech and association. He also argued that the limits are so low as to unconstitutionally interfere with his ability to support candidates and to communicate with potential supporters for fundraising purposes. He argued that Proposition A is not narrowly tailored to meet the State's interests of avoiding corruption or the appearance of corruption, and will not prevent wealthy special interests from opposing candidates.

After hearing evidence and receiving briefs, the district court denied the injunction. Carver, 882 F. Supp. at 902. The court recognized that Buckley v. Valeo, 424 U.S. 1 (1976) (per curiam), governed the issues. Carver, 882 F. Supp. at 903. The court read from Buckley that "a major purpose of the First Amendment is to protect political speech," and that "[l]imitations on these rights are permissible where a compelling state interest is served, if the limitations imposed are narrowly tailored to serve that interest." Carver, 882 F. Supp. at 903-04. The court observed that the Supreme Court has recognized that governments have a compelling interest in preventing corruption and the appearance of corruption that may result from individuals making large contributions to candidates. Id. at 904 (citing Buckley, 424 U.S. at 25-27).

The district court ruled that the Proposition A limits were not so low as to be an unconstitutional restriction of First Amendment rights. Id. at 904-05. The court held that "the law is tailored narrowly enough to help the state meet its goals of eliminating some of the means of corruption and of avoiding the appearance of corruption." Id. at 906. The court observed that Proposition A does not prevent candidates from spending their own money on their campaigns.[4] Id. The court stated that, although Proposition A does not address all of the problems related to campaign finance, it is a positive step toward eliminating political corruption, even if it is not comprehensive. Id. It may not close all of the loopholes, but that does not make it unconstitutional. Id. Carver appeals.

## I.

Carver argues before us, as he did in the district court, that the Proposition A contribution limits restrict his First Amendment rights to political communication and association. He contends that, because the Proposition A limits burden fundamental First Amendment rights, they are subject to strict scrutiny and do not serve a compelling state interest. The State argues that we should apply an intermediate standard of review, but even if we apply strict scrutiny, the Proposition A limits are narrowly tailored to address a compelling state interest.

---

[4]This issue was not before the district court. However, the district court in Shrink Missouri Government PAC, 882 F. Supp. at 1251, addressed the applicability of Proposition A to the candidate's own contributions. The district court found that when Proposition A and Mo. Rev. Stat. § 130.011(12)(a) (1994) are read together, the statute limits a candidate's ability to spend his own money on his campaign. Id. Finding that Buckley prohibits a limit on the amount a candidate may contribute to his own campaign, the district court enjoined the application of section 130.011(12)(a) to the Proposition A contribution limits. Shrink Mo. Gov't PAC, 882 F. Supp. at 1251. We affirmed this holding in Shrink Missouri Government PAC v. Maupin, No. 95-2857, slip op. at 3-4.

The Supreme Court identified the interests implicated by contribution limits in <u>Buckley</u>, 424 U.S. at 14 (citations omitted):

> [C]ontribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. . . . The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." . . . "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . . ."

"[C]ontribution and expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties . . . ." <u>Id.</u> at 18.

In view of these fundamental interests, the Court has instructed that campaign contribution limits are "subject to the closest scrutiny." <u>Id.</u> at 25 (quoting <u>NAACP v. Alabama</u>, 357 U.S. 449, 460-61 (1958)). Under this standard, "a significant interference with protected rights of political association may be sustained" only when the State can demonstrate "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." <u>Id.</u> (quotations omitted) (citing <u>Cousins v. Wigoda</u>, 419 U.S. 477, 488 (1975); <u>NAACP v. Button</u>, 371 U.S. 415, 438 (1963); <u>Shelton v. Tucker</u>, 364 U.S. 479, 488 (1960)).

After identifying the interests and the applicable level of review, the Court in <u>Buckley</u>, 424 U.S. at 58-59, upheld the constitutionality of the $1,000 contribution limit for federal elected offices. The Court reasoned that the $1,000 contribution limit focused precisely on the problem of large campaign contributions and, therefore, was narrowly tailored to the goal of

limiting corruption and the appearance of corruption.  Id. at 26-28.  The Court pointed out that a contribution limit "entails only a marginal restriction upon the contributor's ability to engage in free communication" and does not materially undermine "the potential for robust and effective discussion of candidates and campaign issues . . . ."  Id. at 20-21, 29. The Court characterized a contribution as only "a general expression of support for the candidate and his views," explaining that "the transformation of contributions into political debate involves speech by someone other than the contributor."  Id. at 21.

The Court recognized that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy."  Id. at 21.  The Court found no evidence that the $1,000 limit prevented candidates and political committees from amassing the resources necessary for effective advocacy.  Id. at 21.  The Court refused to analyze the propriety of the specific dollar amount of the contribution limits.  Id. at 30.  The Court cautioned, however, that if the contribution limits were too low, the limits could be unconstitutional. Id.

The Court struck down the independent expenditure limitation which prohibited a candidate from using more than $1,000 of his own money in his campaign and also limited a candidate's total campaign expenditures.  Id. at 39.  The Court distinguished limits on expenditures from limits on contributions, concluding that the expenditure limits were more restrictive of speech, as they "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.  This is because virtually every means of communicating in today's mass society requires the expenditure of money."  Id. at 19 (footnote omitted).

In addition, the Court concluded that the government interest in preventing corruption or the appearance of corruption could not justify the ceiling on independent expenditures. Id. at 45, 53-54. The Court found little relationship between the interest of avoiding corruption and limiting expenditures to one's own campaign or limiting overall campaign expenditures, particularly in light of the limit on campaign contributions. Id. at 55.

The State argues that the Court in Buckley applied strict scrutiny only to legislation limiting independent expenditures and applied a lower, intermediate standard of review to contribution limits. Citing the passages from Buckley referred to above, the State argues that contribution limits are entitled to an intermediate level of scrutiny because contributions are only symbolic expression of support, and limiting contributions does not infringe on the contributor's freedom to discuss candidates and issues.

We recognize that the Court distinguished restrictions on independent expenditures from restrictions on contributions. Buckley, 424 U.S. at 20-21. Since Buckley, members of the Court, in dicta, have indicated that contribution limits should receive a lower level of scrutiny. See Federal Election Comm'n v. Massachusetts Citizens for Life, 479 U.S. 238, 259-60 (1986); California Medical Ass'n v. Federal Election Comm'n, 453 U.S. 182, 196 (1981) (Marshall, J., plurality); Citizens Against Rent Control v. Berkeley, 454 U.S. 290, 301 (1981) (Marshall, J., concurring in judgment). In contrast, other members of the Court strongly disagree, arguing that nothing less than strict scrutiny should apply to contribution limits. See California Medical Ass'n, 453 U.S. at 201-02 (Blackmun, J., concurring in part and in judgment); Citizens Against Rent Control, 454 U.S. at 302 (Blackmun and O'Connor, JJ., concurring in judgment) ("ordinance cannot survive constitutional challenge unless it withstands `exacting scrutiny'"). The Court has not ruled that anything other than

-9-

strict scrutiny applies in cases involving contribution limits.  When the Court in Buckley analyzed the contribution limits, it articulated and applied a strict scrutiny standard of review.  Id. at 25.  Therefore, like other courts since the Buckley decision, we must apply the "rigorous" standard of review articulated in Buckley.  See, e.g., Harwin v. Goleta Water Dist., 953 F.2d 488, 491 n.6 (9th Cir. 1991) (recognizing that contribution limits may be subject to a lower level of scrutiny, but requiring the government to show "a sufficiently important interest and employ[] means closely drawn to avoid unnecessary abridgement of associational freedoms") (quoting Buckley, 424 U.S. at 25).

Moreover, that voters adopted Proposition A by initiative does not affect the applicable level of scrutiny.  We must analyze Proposition A under the same standard that we apply to the product of a legislature.  "It is irrelevant that the voters rather than a legislative body enacted [a statute], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation."  Citizens Against Rent Control, 454 U.S. at 295.

Thus, we apply strict scrutiny in this case, and the State must show that the Proposition A limits are narrowly tailored to meet a compelling state interest.  "When the Government defends a regulation on speech . . . it must do more than simply `posit the existence of the disease sought to be cured.' . . .  It must demonstrate that the recited harms are real, . . . and that the regulation will in fact alleviate these harms in a direct and material way."  United States v. National Treasury Employees Union, 115 S. Ct. 1003, 1017 (1995) (quoting Turner Broadcasting Sys., Inc. v. Federal Communications Comm'n, 114 S. Ct. 2445, 2470 (1994) (Kennedy, J., plurality)).

## II.

In Buckley, 424 U.S. at 25-26, the Court identified the compelling interest as "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." Id. at 25 (emphasis added). The Court reiterated this interest at least seven times. Id. at 25-29. It found it unnecessary to look beyond this primary interest to the remaining interests offered to justify contribution limits. Id. at 25-26 (identifying the other interests as equalizing the relative ability of all citizens to affect the outcome of an election and slowing the skyrocketing cost of political campaigns). The Court, in discussing large contributions, specifically referred to disturbing examples surfacing after the 1972 election.[5] Id. at 27. Examining the 1974 election, the Court found that the $1,000 contribution limit would not severely impact political dialogue, pointing out that most contributions (94.9 percent in the 1974 election) came from contributions of $1,000 or less. Id. at 21 n.23, 26 n.27. The Court decided that in addition to requiring the disclosure of contributions, Congress was entitled to conclude that contribution limits were necessary "to deal with the reality or appearance of

_____

[5]In Buckley, 424 U.S. at 27 n.28, the Court cites the court of appeals discussion of such abuses in Buckley v. Valeo, 519 F.2d 821, 839-40 nn.36-38 (D.C. Cir. 1975) (per curiam). The court of appeals listed examples of large contributions including: dairy organizations pledging two million dollars to the Nixon campaign in an effort to schedule a meeting with White House officials regarding price supports, id. at 839 n.36; contributions from the American Dental Association to incumbent California congressmen, id. at 839 n.37; contributions by H. Ross Perot, whose company supplied data processing for medicare and medicaid programs, to members of the House Ways and Means Committee, the Senate Finance Committee, and the House Appropriations Committee, id.; and large contributions by those seeking ambassadorial appointments from President Nixon, id. at 840 n.38.

corruption inherent in a system permitting unlimited financial contributions." Id. at 28.

The Supreme Court recently reaffirmed that the compelling interest identified in Buckley was limiting large contributions to candidates. The Court stated:

> Buckley identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a candidate:
>
> > To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined. . . .
> >
> > . . . Congress could legitimately conclude that the avoidance of the appearance of improper influence is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent.

Citizens Against Rent Control, 454 U.S. at 296-97 (citations and quotations omitted) (emphasis added).

The district court held that "[u]nder Buckley, Missouri clearly has a compelling state interest in limiting campaign contributions." Carver, 882 F. Supp. at 904. This does not square with the interest of limiting "large campaign contributions" as defined in Buckley. The district court's decision substantially broadens the compelling interest identified in Buckley. The district court erred as a matter of law in extending Buckley to the infinitely broader interest of limiting all, not just large, campaign contributions.

The rationale of the district court's opinion is perhaps explained by the State's argument before us.  The State sets out the compelling state interest justifying Proposition A in general terms.  The State identifies the compelling interest as that of attacking, "not just the reality, but even the appearance or perception of corruption that may take the form of a `quid pro quo' between a contributor and a candidate."[6]  The State, however, fails to refine this general interest consistent with the compelling interest defined by the Court in Buckley as limiting the reality or perception of undue influence and corruption from large contributions.  See Citizens Against Rent Control, 454 U.S. at 296-97.  We examine the contribution limits in section 130.100 in light of this compelling interest.

---

[6]In its amicus brief, The Association of Community Organizations For Reform Now (ACORN) adds the two interests not reached in Buckley to justify the contribution limits in Proposition A.  ACORN includes equalizing the relative ability of all citizens to affect the outcome of elections as additional justification for the Proposition A limits.  This latter interest is close to running afoul of the Court's statement in Buckley, 424 U.S. at 48-49, that restricting "the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment . . . ."  See also Shrink Mo. Gov't PAC, No. 95-2857, slip op. at 8-9.  In addition, ACORN states that supporters of Proposition A sought to change the nature of local campaigns away from "hot button sound bites" in thirty-second television commercials toward a substantive discussion of the issues.  As laudable as this interest may appear, these comments, on their face, manifest a content based restriction on expression and association.  See Turner Broadcasting Sys., 114 S. Ct. at 2459 (discussing content based restrictions).

# III.

## A.

Our review of the district court's factual findings in this First Amendment case is governed by the Supreme Court's recent decision of Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 115 S. Ct. 2338 (1995). The Court instructed that, when considering whether the petitioners' activity is protected speech, we have "a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court." Id. at 2344 (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984)). The Court explained:

> The requirement of independent appellate review is a rule of federal constitutional law . . . . [T]he reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection. Even where a speech case has originally been tried in a federal court, subject to the provision of Federal Rule of Civil Procedure 52(a) that findings of fact shall not be set aside unless clearly erroneous, we are obliged to make a fresh examination of crucial facts.

Id. (citations and quotations omitted). Hurley requires that we independently review the facts to decide whether certain conduct is entitled to First Amendment protection. The factual findings surrounding the determination of whether the Proposition A limits unconstitutionally interfere with Carver's free speech and association rights are so intermingled with the constitutional questions of law that we are obligated "to make an independent examination of the whole record . . . ." Id. (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)).

**B.**

In considering Carver's argument that "the limits imposed by Proposition A are so low as to be an unconstitutional restriction of First Amendment rights of speech and association," the district court acknowledged that "what determines the constitutionality of the limits is the dollar amount of the limits." Carver, 882 F. Supp. at 904-05. Comparing the $1,000 limit on contributions to candidates for federal offices in Buckley with the Proposition A limits, the court emphasized the incremental nature of the Proposition A limits, which vary according to population and the office being sought.[7] Id. at 905. The court concluded that "[t]he stairstepping of the contribution limits demonstrates a more narrow tailoring of Proposition A to fit the state's goal." Id.

The district court observed that there was no evidence that the Proposition A limits would dramatically affect campaign funding or candidates' ability to communicate to the voters. Id. The court relied on the fact that twenty-seven states and the federal government have imposed contribution limits, and that an overwhelming seventy-four percent of Missouri voters "determined that contribution limits are necessary to combat corruption and the appearance thereof." Id. The court found that "Proposition A does not favor incumbents and that many challengers welcome limits on contributions as a way to stop incumbents from accepting large contributions." Id. Finally, the district court referred to expert testimony indicating that more people will contribute to campaigns when contribution limits are in place, because people feel that the candidates will appreciate and be more responsive to smaller contributors. Id. at 905-06.

---

[7]The Proposition A limits stand alone, as Missouri does not provide public funds for campaign purposes, unlike the United States and a number of other states.

These findings may address the desirability of campaign contribution limits, but they do not focus on whether the Proposition A limits are narrowly tailored to address the reality or appearance of corruption associated with large contributions. While indicating popular sentiment in favor of campaign finance reform, the fact that seventy-four percent of the voters approved Proposition A does not assist our analysis, because voters may not adopt an unconstitutional law any more than the legislature. Citizens Against Rent Control, 454 U.S. at 295; see also U.S. Term Limits, Inc. v. Thornton, 115 S. Ct. 1842, 1871 (1995) (holding unconstitutional congressional term limits adopted by voter initiative).

The district court's discussion shows the district court posed, but did not answer, the question of whether the contribution limits were too low. Instead, the court only concluded that the stairstepping of the limits demonstrated that the limits were narrowly tailored. The fact that Proposition A sets forth graduated limits has nothing to do with whether the limits are so low as to be unconstitutional.

## C.

Carver argues that the evidence establishes that the limits in Proposition A violate his right to associate as a contributor. The State responds that Carver has not proved that Proposition A limits his right to contribute at a meaningful level. The State contends that the Proposition A limits do not prevent Carver from effectively speaking on behalf of a candidate or joining with other individuals to express themselves in constitutionally protected independent committees, such as those involved in Day v. Holahan, 34 F.3d 1356 (8th Cir. 1994), cert. denied, 115 S. Ct. 936 (1995). The State argues that there was no proof that contributors like Carver could not find other outlets for effectively expressing their message in Missouri elections.

-16-

While the extent of Carver's testimony is at best skeletal, it is sufficient to demonstrate that Carver has contributed, and intends to contribute in the future, amounts in excess of the Proposition A limits to support his interest in "good candidates" and "good government."  The State's argument that Carver could continue to exercise his First Amendment rights by joining an independent group does not address whether the limits are so low as to prevent Carver from freely associating with a candidate.

The State points out that Buckley does not require specific proof of the maximum contribution limit, and that we may not use "a scalpel" to invalidate Proposition A.  It is true that the Court did not analyze the propriety of the $1,000 limit.  Indeed, the Court observed that while Congress could have structured the limits in a graduated fashion for congressional and presidential campaigns, its failure to do so did not invalidate the legislation.  Buckley, 424 U.S. at 30.  The Court reiterated the court of appeals' statement that "a court has no scalpel to probe" whether a different ceiling might not serve as well.  Id.  Although we certainly are not free to fine tune the limits established by Proposition A, and we generally accept the limits established by the legislature, Buckley instructs that we must invalidate that judgment when the "distinctions in degree" become "differences in kind."  Id.

The Court in Buckley, 424 U.S. at 30, pointed to two decisions, Kusper v. Pontikes, 414 U.S. 51 (1973), and Rosario v. Rockefeller, 410 U.S. 752 (1973), as illustrating differences in kind.  In Rosario, 410 U.S. at 754, the Court approved a party enrollment provision requiring a voter to enroll in a party at least thirty days before the general election in order to vote in the next party primary.  The Court held that, although the cutoff date for enrollment could occur up to eight months before a presidential primary, and up to eleven months before a nonpresidential primary, the requirement was not arbitrary and

unconnected to the important state goal of inhibiting party raiding.  Id. at 760.

The Court, however, struck down a party enrollment requirement in Kusper, 414 U.S. at 52, which prohibited a voter from voting in the primary election of a political party if he had voted in the primary of another party in the preceding twenty-three months.  The Court reaffirmed its decision in Rosario, but held that the enrollment requirement at issue caused a two-year delay for certain voters, and thus, violated the voter's right to free political association.  Id. at 61.  Although the Court allowed an eight-month delay in Rosario, the almost two-year delay in Kusper, nearly three times the delay approved in Rosario, crossed the constitutional line.  Thus, the enrollment requirement in Kusper amounted to a "difference in kind."

Similarly, in Day, 34 F.3d at 1365, we dealt with the issues raised by very low contribution limits.  We considered the constitutionality of a Minnesota statute imposing a $100 limit on contributions to political committees.  Although Day did not consider contribution limits to candidates, we compared the $100 limit on contributions to political committees in Day to the $1,000 limit on contributions to candidates considered in Buckley.  Day, 34 F.3d at 1366.  After recognizing that the $1,000 limit in Buckley was not a "constitutional minimum," we nevertheless concluded that the $100 limit significantly impaired the ability of contributors to exercise their First Amendment rights.  Id.  We held that the limit was "too low to allow meaningful participation in protected political speech and association," and we concluded that the law was "not narrowly tailored to serve the state's legitimate interest in protecting the integrity of the political system."  Id.  In reaching this conclusion, we relied on the fact that about 25 to 33 percent of the contributions to political committees in the most recent election exceeded the $100 limit, and that after adjusting for inflation, the limit was about 4 percent

of the $1,000 limit in <u>Buckley</u>.  <u>Id.</u>  Our observation in <u>Day</u> about the effect of inflation applies with equal force in this case.

The district court referred to the fact that twenty-seven states have contribution limits, but it did not analyze the limits in detail.  Any meaningful comparison of these limits must include consideration of not only the amount, but also whether the limits are per election cycle or per election.  The Proposition A limits, ranging from $100 to $300 per election cycle, are dramatically lower than the $2,000 limit per election cycle approved in <u>Buckley</u>.[8]  Not only are the Proposition A limits much lower than the federal limits, they are lower than the limits in any other state. Two states, Montana and Oregon, have limits for state senate races that equal those in Proposition A, but their limits for statewide offices and state representatives are greater than those in Missouri.[9]

---

[8]Employing our analysis in <u>Day</u>, the amicus brief of the American Civil Liberties Union points out that after adjusting for inflation, Proposition A's $300 limit is 6 percent of the limit per election cycle considered in <u>Buckley</u>, the $200 limit is 4 percent of the <u>Buckley</u> limit per election cycle, and the $100 limit is only 2 percent of the <u>Buckley</u> limit per election cycle.

[9]Montana and Oregon recently adopted these restrictive contribution limits by initiative.  <u>See</u> Mont. Code Ann. § 13-37-216 (Supp. 1995); 1995 Or. Laws 1, 3.  The Montana limits are on a per election basis, but when they are converted to an election cycle basis, the limits are:  (1) $800 to candidates filed jointly for the office of Governor and Lieutenant Governor, (2) $400 to candidates in a statewide election other than Governor and Lieutenant Governor, and (3) $200 to candidates for any other public office.  Mont. Code Ann. § 13-37-216.  When similarly considered, the Oregon limits are:  (1) $1,000 to a candidate for "Governor, Secretary of State, State Treasurer, Superintendent of Public Instruction, Attorney General, Commissioner of the Bureau of Labor and Industries or judge of the Supreme Court, Court of Appeals or Oregon Tax Court" and (2) $200 to a candidate for State Senator or State Representative.  1995 Or. Laws 3.

The question thus becomes whether Missouri must adopt the lowest contribution limits in the nation to remedy the corruption caused by large campaign contributions. The State presented testimony at trial about a $420,000 contribution from a Morgan Stanley political action committee to various races in north Missouri, and about the "Keating Five" scandal.[10]

None of these examples prove that the Proposition A limits are narrowly tailored. A $420,000 contribution is a far cry from the limits in Proposition A, and the other examples involve individual conduct leading to criminal prosecution. We cannot conclude that the limits in Proposition A are in any way narrowly tailored or carefully drawn to remedy such situations. See Massachusetts Citizens for Life, 479 U.S. at 265 (we may "curtail speech only to the degree necessary to meet the particular problem at hand"); Day, 34 F.3d at 1366.

In considering whether the Proposition A limits are narrowly tailored, we must also recognize that the limits were not adopted in a vacuum. The question is not simply that of some limits or none at all, but rather Proposition A as compared to those in Senate Bill 650, which was to become effective January 1, 1995.

---

[10]The ACORN amicus brief also argues that the Proposition A limits are necessary and narrowly tailored, citing the Dewey Crump and William Webster scandals. Dewey Crump was a Missouri State Representative accused of sponsoring legislation in exchange for kickbacks. William Webster was Missouri's Attorney General who pleaded guilty to a charge of conspiracy to misuse state property.

The Proposition A limits are only ten to twenty percent of the higher limits in Senate Bill 650.[11] The State produced no evidence as to why the Proposition A limits of $100, $200, and $300 were selected. Further, the State presented no evidence to demonstrate that the limits were narrowly tailored to combat corruption or the appearance of corruption associated with large campaign contributions. See Buckley, 424 U.S. at 25. The record is barren of any evidence of a harm or disease that needed to be addressed between the limits of Senate Bill 650 and those enacted in Proposition A. See National Treasury Employees Union, 115 S. Ct. at 1017.

---

[11]On an election cycle basis, the contribution limits contained in Proposition A and Senate Bill 650 compare as follows:

| Office | Senate Bill 650 | Proposition A | Percentage of Senate Bill 650 |
|---|---|---|---|
| Statewide Races | $2,000[a] | $300[b] | 15% |
| State Senator | $1,000[c] | $200[d] | 20% |
| State Representative | $500[e] | $100[f] | 20% |
| Other Races: | | | |
| Less Than 100,000 Pop. | $500[g] | $100[h] | 20% |
| 100,000 to 250,000 Pop. | $1,000[i] | $200[j] | 20% |
| More Than 250,000 Pop. | $2,000[k] | $200[l] | 10% |

[a]Mo. Rev. Stat. § 130.032.1(1).
[b]Mo. Ann. Stat. § 130.100(3).
[c]Mo. Rev. Stat. § 130.032.1(2).
[d]Mo. Ann. Stat. § 130.100(2). Missouri State Senate districts consist of approximately 150,000 people. 1995-96 State of Missouri Official Manual, at 123.
[e]Mo. Rev. Stat. § 130.032.1(3).
[f]Mo. Ann. Stat. § 130.100(1)(a). Missouri State Representative districts consist of approximately 30,000-33,000 people. 1995-96 State of Missouri Official Manual, at 184-85.
[g]Mo. Rev. Stat. § 130.032.1(4).
[h]Mo. Ann. Stat. § 130.100(1)(a).
[i]Mo. Rev. Stat. § 130.032.1(5).
[j]Mo. Ann. Stat. § 130.100(2).
[k]Mo. Rev. Stat. § 130.032.1(6).
[l]Mo. Ann. Stat. § 130.100(2).

In ruling that the contribution limits in <u>Buckley</u> were narrowly tailored, the Supreme Court pointed out that only about five percent of the contributors in the 1974 election gave more than the $1,000 limit. <u>Buckley</u>, 424 U.S. at 21 n.23. The State's own evidence shows that a much higher percentage of contributors will be impacted by the limits in Proposition A. At trial, the State presented exhibits showing contributions made in past races for Auditor, State Senate and State Representative.[12] According to the State's exhibits, in the 1994 Auditor's race, 19.5 percent of the contributors gave more than the $300 Proposition A limit, but less than the $1,000 Senate Bill 650 limit.[13] In the State Senate race, 21.6 percent of the contributors gave more than the $200 Proposition A limit, but less than the $1,000 Senate Bill 650 limit on an election cycle basis.[14] In the State Representative race, 19.0 percent of the contributors gave more than the $100

---

[12]The races were (1) the 1994 State Auditor's race, (2) the 1992 Twenty-Seventh District State Senate race, and (3) the 1992 Tenth District Missouri House of Representatives race. The State selected these sample races because they were among the races with the highest contributions.

[13]19.5 percent is actually too low because the State's exhibit is based on the $1,000 per election limit in Senate Bill 650, and not the $2,000 limit per election cycle. The State's exhibit failed to show the actual number of contributors giving more than the $300 Proposition A limit but less than the $2,000 election cycle limit in Senate Bill 650. The State's exhibit showed that 19.5 percent of the contributions were between $301 and $1,000, and 8.0 percent were more than $1,000. The exhibit does not indicate what percent of the contributions over $1,000 should also be included as being within the $2,000 Senate Bill 650 election cycle limit. While the percentage is undoubtedly higher than the 19.5 percent set out above, the precise amount is not shown.

[14]This is the only race where the exact percentage of contributors giving more than the Proposition A limit but less than the Senate Bill 650 limit on an election cycle basis may be determined from the data presented by the State.

Proposition A limit, but less than the $250 Senate Bill 650 limit.[15]

Further, the State's exhibits show that 27.5 percent of the contributors in the 1994 Auditor's race gave more than the $300 Proposition A limits. In the State Senate race, 23.7 percent of the contributors gave more than the $200 Proposition A limit. Finally, in the State Representative race, 35.6 percent of the contributors gave more than the $100 Proposition A limit.

The State made no showing as to why it was necessary to adopt the lowest contribution limits in the nation and restrict the First Amendment rights of so many contributors in order to prevent corruption or the appearance of corruption associated with large campaign contributions. Proposition A substantially limits Carver's ability to contribute to candidates and will have a considerable impact on many contributors besides Carver. The State simply argues that limits which are nearly four times as restrictive as the limits approved in <u>Buckley</u> are narrowly tailored. The State argues we may not fine tune the specific dollar amount of the limits, but fails to demonstrate that the Proposition A limits are not a "difference in kind." <u>See</u> <u>Kusper</u>, 414 U.S. at 61 (overturning an enrollment requirement approximately three times longer than that approved by the Court in <u>Rosario</u>). We hold that the Proposition A limits amount to a difference in kind from the limits in <u>Buckley</u>. The limits are not closely drawn to reduce corruption or the appearance of corruption associated with

---

[15]Again, the State's calculation is based on the $250 per election limit in Senate Bill 650, and not on the $500 limit per election cycle. The State's exhibit showed that 19.0 percent of the contributions were between $101 and $250, 15.7 percent were between $251 an $1,000, and 0.9% were more than $1,000. We have no way of knowing what portion of the contributions between $251 and $1,000 fell below the $500 limit per election cycle. Undoubtedly, some of these contributions should be included as between the Proposition A and Senate Bill 650 limits.

large campaign contributions.  Thus, the State has failed to carry its burden of demonstrating that Proposition A will alleviate the harms in a direct and material way, Turner Broadcasting System, 114 S. Ct. at 2470, or is closely drawn to avoid unnecessary abridgement of associational freedoms, Buckley, 424 U.S. at 25.  Accordingly, we conclude that the Proposition A contribution limits unconstitutionally burden the First Amendment rights of association and expression.

**IV.**

The State argues from Turner Broadcasting System, 114 S. Ct. at 2471, that we "must accord substantial deference to the predictive judgments" of the legislature.  The Court explained the deference accorded to congressional action is limited to assuring that "in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence."  Id.  The State argues that we must accord this same deference to Proposition A adopted through the initiative process by the citizens of Missouri.

There are two obstacles in the path of the State's argument.  First, as we have observed before, the voters may no more violate the Constitution than the legislature.  Citizens Against Rent Control, 454 U.S. at 295.  Second, the deference to legislative enactments recognized in Turner Broadcasting System, 114 S. Ct. at 2471, requires that courts ascertain that the legislative body "has drawn reasonable inferences based on substantial evidence."

There is simply no evidence in the record identifying the source of Proposition A, whether it was an individual or group,[16]

_____

[16]Only the amicus briefs identify the sponsors and participants in the initiative campaign for Proposition A.  These include Missourians for Campaign Finance Reform, a coalition composed of the Missouri Public Interest Research Group, ACORN, the Missouri League of Women Voters, and United We Stand - Missouri.

the process of its development, nor the reasons for the particular dollar limits.[17]  Further, there is no evidence of the details of the campaign waged in support of the initiative.  There is, simply put, a failure of proof as to any of the facts Turner Broadcasting System would require that we consider to justify according deference.

Whether the deference Turner Broadcasting System requires for acts of Congress extends to the acts of the state legislative body is an issue not before us to decide.  Legislative bodies consist of elected representatives sworn to be bound by the United States Constitution, and their legislative product is subject to veto by the elected executive, either President or Governor.  The process of enactment, while perhaps not always perfect, includes deliberation and an opportunity for compromise and amendment,[18] and usually committee studies and hearings.  These are substantial reasons for according deference to legislative enactments that do not exist with respect to proposals adopted by initiative.  On the evidentiary showing before us, there is no justification to accord Proposition A the deference that Turner Broadcasting System requires for congressional action.  See Yniguez v. Arizonans for Official English, Nos. 92-17087, 93-15061, 93-15719, 1995 WL 583414, at *21 (9th Cir. Oct. 5, 1995) (en banc) (noting ballot initiative lacked legislative findings and was not subjected to extensive hearings or analysis).

---

[17]Proposition A differs from the initiative procedures in some states, which either require or permit the ballot materials describing the proposition to include a statement of the purposes and reasons for the enactment.  There was no such statement with respect to Proposition A.

[18]Indeed the process of enactment of Senate Bill 650 demonstrates the back and forth action of both the House and the Senate, and considerable effort to achieve a conference substitute agreeable to both bodies.

-25-

**V.**

In conclusion, we hold that the campaign contribution limits in Proposition A, Mo. Ann. Stat. § 130.100, are not narrowly tailored to meet the compelling state interest of limiting the influence of corruption associated with large campaign contributions, and is, therefore, unconstitutional.  We reverse the decision of the district court and remand the case to the district court for the entry of judgment permanently enjoining the State and the Missouri Ethics Commission from implementing, enforcing, or acting in reliance upon section 130.100.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.