JOHN R. GIBSON, Circuit Judge,
dissenting.
I respectfully dissent.
*524 The Court today departs from the teaching of Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and gives far too expansive a reading to the recent decisions of this Court in Carver v. Nixon, 72 F.3d 633 (8th Cir.1995), and Russell v. Burris, 146 F.3d 563 (8th Cir.1998). Upon a record more slender than the one before us, Buckley upheld contribution limits of $1,000 per election for all federal offices, while Missouri’s statute provides a $1,075 limit for statewide offices. Mo.Rev.Stat. § 130.032 (Supp.1997). Because I cannot distinguish Buckley from the present case, I would uphold the contribution limits at issue.
I.
In Carver and Russell, we faced graduated annual contribution limits between $300 for statewide offices and $100 for other offices, and we held that both statutes violated the First Amendment. Carver, 72 F.3d at 641-44; Russell, 146 F.3d at 569-71. Both statutes were adopted by initiative petitions.[1] We contrasted these limitations with those at issue in Buckley — $1,000 per election or $2,000 per election cycle — and found them “different in kind.” Carver, 72 F.3d at 644; Russell, 146 F.3d at 571. For example, we observed that the limitations challenged in Carver were the lowest contribution limits in the nation and that the State had presented only meager evidence to justify these limitations. 72 F.3d at 641-42. The holdings of Carver and Russell, that statewide limits of $300 per election cycle “differ in kind” from the limit in Buckley of $2,000, point compellingly to a different conclusion in this case.
It is of interest that Carver contrasted Proposition A — with limits ranging from $100 to $300 — to the legislation now before us, with limits then ranging from $250 to $1,000. Id. at 642-43. In view of the Attorney General’s opinion, the dollar limits in Proposition A were the more restrictive and therefore provided the relevant limitation on the plaintiffs’ contributions. Id. at 634-35. Carver struck Proposition A’s limits but did not discuss the propriety of the limits now before us. Nevertheless, in contrasting Proposition A’s limits with those enacted by the legislature, the similarity between the legislatively-enacted limits and those in Buckley was evident.
Less evident is how to distinguish Buckley from the present case. When we compare the $1,075 contribution limit[2] imposed by Senate Bill 650 for each election with the $1,000 upheld by Buckley, there is simply no difference in kind. The $1,075 limit applies to statewide races, just as Buckley’s $1,000 limit applies to the Senate, a statewide race, and the presidential elections. Buckley’s reasoning would similarly uphold Senate Bill 650’s lower contribution limits in non-statewide elections. When one accounts for the lower number of voters in non-statewide electoral districts, the limits at issue compare favorably with the $1,000 limit in Buckley, which applied to statewide races as well as to elections for the U.S. House of Representatives. There are nine House districts in Missouri, and in the most recent statewide election, the number of votes cast in these districts averaged 235,094. Official Manual, State of Missouri 563-65 (1997). Meanwhile, Senate Bill 650 imposes a contribution limit of $525 upon races for state senators as well as to certain other elections in districts ranging from 100,000 to less than 250,000 in population. Mo.Rev.Stat. § 130.032 (Supp.1997). There are thirty-five Senate districts in Missouri. Seventeen of these seats were contested in 1996, and an average of 59,254 people voted in each election. Official Manual, State of Missouri 566-67 (1997). When the size of the state senatorial districts is contrasted with federal congressional dis *525 tricts as well as the entire State itself, there is plainly no “difference in kind” between these legislative limits and those countenanced by Buckley. Finally, the same must be said for the $275 limit for state House elections. In the last election, the number of votes cast in such districts averaged 12,325. Id. at 567-80. With the number of voters in such districts, I cannot conclude that the $275 limit “differs in kind” from those that Buckley upheld. As Buckley observed, Congress could have structured limits in a graduated fashion, but its failure to do so did not invalidate the legislation. Buckley, 424 U.S. at 30, 96 S.Ct. 612; Carver, 72 F.3d at 641. Buckley recognizes, then, that graduated limits such as Missouri’s are an acceptable solution to the dangers posed by unlimited campaign contributions.
Carver, Russell, and Part III B of Chief Judge Bowman’s opinion in this case discuss at length the effect of inflation upon the Buckley limits. Carver, 72 F.3d at 641; Russell, 146 F.3d at 570-71. Yet Missouri’s statute expressly addresses the inflation problem, and the $1,000 limit initially enacted hag now grown to $1,075. See Mo.Rev.Stat. § 130.032.2 (Supp.1997) (limits adjusted for inflation). Significantly, the campaign expenditures in Missouri’s statewide elections have risen markedly since Senate Bill 650’s enactment, and there is no basis for rejecting the district court’s conclusion that candidates for office remain “able to amass impressive campaign war chests.”[3]
Buckley, of course, did not establish $1,000 as the constitutional floor for permissible contribution limitations; see Day v. Holahan, 34 F.3d 1356, 1366 (8th Cir.1994). But even if it had, I would reject the argument in Part III B that inflation has dissipated the similarity between the limits in this case and those approved in Buckley. Inflation has not undermined Buckley’s precedential weight or modified its holding. The $1,000 limit upheld in Buckley remains and is the law today, even though we have used inflation to compare present contribution limitations with those upheld in 1976. See Carver, 72 F.3d at 641; Russell, 146 F.3d at 570-71; Day, 34 F.3d at 1366.[4] Despite ample opportunity to modify Buckley, the Supreme Court has never added the “inflation proviso” that Part III B relies upon. If Buckley’s holding must wax and wane with inflation, as Part III B seems to argue, then the very statute that Buckley upheld would now be unconstitutional, for inflation alone would render the $1,000 limit “different in kind” from when the Supreme Court upheld it. Whatever may be the pernicious effects of inflation, I am certain that the First Amendment’s dictates do not depend upon the Consumer Price Index.
More importantly, even if it were proper to adjust Buckley for inflation, Part III B lacks a principled yardstick to assess the constitutionality of any contribution limit. Its measure of what “differs in kind” and what “differs in degree” from the Buckley limits is standardless and lacks any explanation to support its bald conclusion that the limits at issue are “overly restrictive as a matter of law.”[5]
II.
Putting to one side the facial similarity between the statute stricken today and that upheld in Buckley, the State has adequately justified the contribution limits at issue. Buckley and our cases both teach that contribution limits are subject to “the closest scrutiny.” Buckley, 424 U.S. at 25, 96 S.Ct. 612; Carver, 72 F.3d at 636; Russell, 146 F.3d at 567. The State has the burden to demonstrate a compelling interest, which Buckley defined as limiting the reality or appearance *526 of political corruption stemming from large financial contributions. 424 U.S. at 26, 96 5.Ct. 612. Both Carver and Russell found no direct evidence of real or perceived undue influence. Carver, 72 F.3d at 642-43; Russell, 146 F.3d at 569-70. Accordingly, we struck the contribution limits in both cases.
The present case is readily distinguishable from Carver and Russell. Although the House and Senate in Missouri preserve no formal legislative history, the record hardly lacks evidence that the statute at issue limits the reality or perception of undue influence and corruption. In summary judgment papers, the State presented an affidavit of Senator Wayne Goode. Goode served twenty-two years in the Missouri House and nine years in the Senate before he co-chaired the Joint Interim Committee on Campaign Finance Reform that prepared Senate Bill 650, now the statute before us. The senator stated that the Committee heard “a broad spectrum of opinions ... on the issue of campaign contribution limits.” He described the committee discussions of what it costs to run a campaign and the level at which contributions threaten to corrupt political officials and to erode public confidence in the electoral process. The committee heard testimony on the issue of balancing the need to run an effective campaign against the need to limit the potential for buying influence. Balancing the concerns, the committee reached the contribution limits of $250 to $1,000 by consensus.[6] Goode and the other members believed that contributions over those limits create both the appearance that contributors could purchase the votes of elected officials and the danger of actual vote-buying. The most recent elections themselves suggest that the State has limited at least the appearance of corruption in the political process. Goode Affidavit, ¶ 11; J.App. 171. The limits prevent disproportionate funding of particular campaigns and curtail the opportunities for buying political influence. Id. This evidence stands in stark contrast to the lack of evidence on these issues in Carver and Russell,[7]
In addition to the description in Senator Goode’s affidavit, what record is available to us reflects that the House and Senate in Missouri exerted considerable effort in reaching accord on the bill finally enacted. Two bills containing contribution limits were introduced in the House, House Bills 1304 and 1523. Senate Bill 801 was introduced and passed in the Senate, and the House passed the House Committee’s substitute for Senate Bill 650. A conference committee substitute for the House Committee substitute for Senate Bill 650 was ultimately adopted by the House and Senate and signed by the Governor. This action in both legislative bodies demonstrated the careful attention given to this legislation and the give- and-take before final enactment. We commented upon this process in Carver. 72 F.3d at 645 n. 18.
Carver also recited the Supreme Court’s admonition that we “must accord substantial deference to the predictive judgments of the legislature.” 72 F.3d at 644 (quoting Turner Broadcasting System v. FCC, 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). Turner referred to the deference owed to Congressional findings. In Carver, we left open the question whether state legislatures are due similar deference. Carver, 72 F.3d at 644. Although Carver rejected the State’s argument that we should accord such deference to a citizens’ initiative, the limitations *527 now before us became law only after careful and informed deliberation by the legislature. The Court should not so lightly cast aside the legislature’s findings in favor of its own. It is hardly counterintuitive that large campaign contributions might corrupt polities and invite public cynicism. The State has imposed only modest restrictions upon political speech, and it need not justify them with scientific precision.
The Court’s rejection of the description of Senate Bill 650’s legislative underpinnings is plainly at odds with Buckley. Accepting the argument that the appearance of political corruption could justify the limitations then at issue, Buckley stated:
Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions ... Here, ... Congress could legitimately conclude that the avoidance of the appearance of improper influence “is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent.”
424 U.S. at 27 (quoting United States C.S.C. v. Letter Carriers, 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)). It is true that the State must do more than simply “posit the existence of the disease to be cured.” See Carver, 72 F.3d at 638 (citing United States v. National Treasury Employees Union, 513 U.S. 454, 475, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (quoting Turner Broadcasting System v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (Kennedy, J., plurality))). The State, by the Goode affidavit, has demonstrated not only the dangers posed by unlimited campaign contributions, but also the conclusions reached as to “alleviat[ing] these harms in a direct and material way.” Id.
I cannot reconcile the short shrift given the Goode affidavit by the Court today with the Supreme Court’s approach in Buckley, which cited no actual evidence that large contributions might give rise to the appearance of political corruption and which deferred to what Congress could have reasonably concluded.[8] See 424 U.S. at 27, 28, 30, 96 S.Ct. 612 (Congress “could legitimately conclude” that avoiding the appearance of corruption is essential to maintaining confidence in government; Congress “was surely entitled to conclude” that disclosure limitations alone would not adequately combat corruption and its appearance; Congress “was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.”).
Senate Bill 650 is premised upon just such reasonable legislative conclusions, as evidenced by Senator Goode’s affidavit. The Court today rejects those conclusions, which closely resemble those recognized by Buckley when it upheld limitations strikingly similar to those now at issue. In rejecting the state’s evidence, the Court sidesteps binding Supreme Court precedent and fails to provide meaningful guidance to those who might hope to craft campaign reform legislation that will survive this Court’s unprecedented scrutiny.
III.
It must also be noted that the Sixth Circuit has recently approved a Kentucky law with a contribution limit of $1,000 per election year. Kentucky Right to Life v. Terry, 108 F.3d 637, 648 (6th Cir.1997). The Court creates a conflict between the circuits, and in doing so disregards the inescapable similarity between the legislation that it strikes and that which the Supreme Court upheld.
*528 Perhaps members of the Court quarrel not only with the contribution limits at issue today, but with Buckley itself, as was made evident during oral argument. We are bound by Buckley unless and until the Supreme Court declai-es otherwise.
I would affirm the summary judgment of the district court upholding the contribution limits in Senate Bill 650. court settlement agreement which the parties attached to and incorporated by reference in their joint motion to voluntarily dismiss the appeal.
The motion of Judicial Watch, Inc. for leave to file an amicus curiae brief in opposition to dismissal is denied.
The appeal is dismissed.

. The Arkansas statutes in Russell had a $100 limit for all state offices other than the enumerated offices which were elected statewide. Russell, 146 F.3d at 565. The provisions at issue in Carver contained limitations of $100 per election cycle for candidates in districts with fewer than 100,000 residents; $200 for candidates in districts of 100,000 or more residents; and $300 for statewide candidates. Carver, 72 F.3d at 635.

. The legislation at issue imposes a limit of $1,075 per election, but a $2,150 limit per "election cycle.’’ An "election cycle” is the "period of time from [the] general election for an office until the next general election for the same office.” Mo.Rev.Stat. § 130.011 (Supp.1995). It is of interest that the average household income in Missouri is about $31,000 per year.

. See District Court Memorandum and Order at 15-16, J.App. 191-92; see also J.App. 43-52.

. In all three cases, the limits at issue were patently "different in kind” from the limits in Buckley, with' or without the aid of inflation. Carver and Russell struck election cycle limits ranging from $300 for statewide offices to $100 for other offices, while Day struck a $100 limit. Carver, 72 F.3d at 641-44; Russell, 146 F.3d at 569-71; Day, 34 F.3d at 1366.

.Indeed, even with the aid of inflation, it does not follow that today’s contribution limits "differ in kind” from what the Supreme Court upheld in 1976. Differing costs, whether higher or lower, of new communications media (fax machines, email, and the Internet, as well as more traditional modes of political speech) and modem fund-raising methods (the emergence of "soft money” is but one relevant post -Buckley development) simply make comparison a morass of conjecture.

. The Court today attempts to minimize Senator Goode’s affidavit as the testimony of a single legislator, but the affidavit contains the Senator's description of the legislature’s conclusions, which is precisely the support cited by Buckley when it upheld the contribution limits imposed by Congress. See 424 U.S. at 27, 28, 30, 96 S.Ct. 612. It must again be emphasized that Goode's observations are those of the co-chair of the joint legislative committee from which the limits at issue originated. To brand his affidavit as "self-serving, given the senator's vested interest in having the courts sustain the law that emerged from his committee” not only rules upon the credibility of a witness on a summary judgment motion, but also gratuitously impugns the senator's description of the evidence before the Committee, the conclusions drawn by the Committee, and his fellow legislators’ first-hand knowledge of what it costs to wage a campaign and the dangers presented by contributions above the limits enacted.

. Carver and Russell involved only evidence of certain specific contributions, without evidence of their impact, as after-the-fact justifications for the initiative proposals at issue.

. Although the need to limit the perception of political corruption by itself justifies the contribution limits at issue, today’s opinion takes note of what little evidence of actual corruption was before the Buckley court: the "perfidy that had been uncovered in federal campaign financing in 1972.” See Buckley, 424 U.S. at 27 n. 28, 96 S.Ct. 612. Yet Buckley's passing reference to the 1972 election does not aid this Court's opinion. Buckley nowhere supports the particular scrutiny undertaken by the Court today. Certainly, it provides no suggestion that the Goode affidavit would fail to satisfy whatever evidentiary inquiry is required to support a legislative body’s conclusion that financial contributions have created or will create the appearance of corruption.