**MONTANA RIGHT TO LIFE ASSOCIATION, Montana Right to Life Political Action Committee, Julie Daffin, President of Montana Right to Life Association, Plaintiffs,**

**v.**

**Robert EDDLEMAN, in his official capacity as County Attorney for Stillwater County, Montana, and as a representative of the class of district attorneys in the State of Montana, and Ed Argenbright, in his official capacity as Commissioner of Political Practices for the State of Montana, Defendants.**

No. CV 96–165–BLG–JDS.

United States District Court,
D. Montana,
Billings Division.

Feb. 3, 1998.

Timothy J. Whalen, Whalen & Whalen, Billings, MT, Kenneth H. Gray, Jackson & Rice, Helena, MT, James Bopp, Jr., John K. Abegg, Richard E. Coleson, Robert J. Newmeyer, Bopp, Coleson & Bostrom, Terre Haute, IN, for Montana Right to Life Association, Montana Right to Life Political Action Committee.

Timothy J. Whalen, Whalen & Whalen, Billings, MT, James Bopp, Jr., Robert J. Newmeyer, Bopp, Coleson & Bostrom, Terre Haute, IN for Julie Daffin.

**1382**

Clay R. Smith, Elizabeth S. Baker, W.D. Hutchison, Office of the Montana Attorney General, Helena, MT, for Robert Eddleman, Ed Argenbright.

Jonathan R. Motl, Reynolds, Motl, Sherwood & Wright, Helena, MT, for I–125 PC, I–118 PC, Montana Public Interest Research Group, C.B. Pearson.

## ORDER

SHANSTROM, Chief Judge.

Plaintiffs Montana Right to Life Association (MRL), Montana Right to Life Political Action Committee (MRLPAC), and Julie Daffin move for summary judgment contending several Montana election and campaign practice statutes run afoul of the First and Fourteenth Amendments.

*1. Mont.Code Ann. § 13–35–227*

■ **13–35–227. Prohibited contributions from corporations for candidates or political parties.** (1)(a) A corporation may not make a contribution or an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party.

(b) For purposes of this section, "corporation" refers to for-profit and nonprofit corporations.

(2) A person, candidate, or political committee may not accept or receive a corporate contribution described in subsection (1).

(3) This section does not prohibit the establishment or administration of a separate, segregated fund to be used for making political contributions or expenditures if the fund consists only of voluntary contributions solicited from individuals who are shareholders, employees, or members of the corporation.

(4) A person who violates this section is subject to the civil penalty provisions of 13–37–128.

Plaintiffs argue that the prohibition on independent expenditures by nonprofit corporations in the above-quoted statute is (1) unconstitutional on its face, (2) unconstitutional as applied to MRL, or in the alternative (3) void for vagueness.

■ The Supreme Court has recognized that independent expenditures constitute expression at the core of our electoral process and First Amendment freedoms. *Buckley v. Valeo*, 424 U.S. 1, 39, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). When a statutory provision burdens First Amendment rights it must be narrowly tailored to serve a compelling state interest. *Id.* at 44–45.

In *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) the Supreme Court determined that a federal election campaign statute was unconstitutional as applied to Massachusetts Citizens for Life (MCFL), a nonprofit corporation, whose corporate purpose was to foster respect for human life and to defend the right to life of all human beings, born and unborn, through educational, political and other forms of activities. The election statute at issue in *Massachusetts Citizens for Life* prohibited corporations from using their treasury funds to make expenditures in connection with any federal election and required that any expenditure for such purpose be financed by voluntary contributions to a separate segregated fund.

In making its determination that MCFL was not constitutionally bound by a restriction on independent spending the Supreme Court noted that the following three features of the nonprofit corporation were essential to its holding.

[MCFL] was formed for the express purpose of promoting political ideas, and cannot engage in business activities. If political fundraising events are expressly denominated as requests for contributions that will be used for political purposes, including direct expenditures, these events cannot be considered business activities. This ensures that political resources reflect political support. Second, [MCFL] has no shareholders or other persons affiliated so as to have a claim on its assets or earnings. This ensures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity. [footnote omitted] Third, MCFL was not established by a business corporation or a labor

union, and it is its policy not to accept contributions from such entities. This prevents such corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace. *Massachusetts Citizens for Life,* 479 U.S. at 263–65, 107 S.Ct. at 631. The Supreme Court also noted that "some corporations have features more akin to voluntary political associations than business firms, and therefore should not have to bear burdens on independent spending solely because of their incorporated status." *Id.*

According to its Articles of Incorporation, as amended, Montana Right to Life

1. [i]s established for the purpose of informing the public on issues related to the right to life of all human beings, from conception to death.

2. To achieve this purpose, the Association may publish or cause to be published such literary and scientific works as will truly clarify the issues and delineate alternatives from public consideration.·

3. The Association may also lend its support to those agencies and programs, in its judgment, attempt to further genuine respect for human life in our day.

Montana Right to Life was not established by a business corporation or a labor union. Montana Right to Life has no shareholders or other persons affiliated with it so as to have a claim on its assets or earnings. Upon dissolution, its assets shall be transferred to Lutheran Social Services of Montana and Catholic Charities of Montana for the support of adoption services.

For purposes of First Amendment analysis Montana Right to Life is indistinguishable from MCFL. Because Montana Right to Life has features more akin to a voluntary political association it shall not be bound by a restriction on independent campaign spending. Mont.Code Ann. § 13–35–227 is unconstitutional as applied to Montana Right to Life.

### 2.   *Mont.Code Ann. § 13–35–233*

■ This particular statute makes it unlawful for a person or a political committee to place an advertisement supporting or opposing a candidate or a ballot issue for use on election day. In a thorough and well-reasoned opinion, *National Right to Life Political Action Committee v. McGrath,* 982 F.Supp. 694 (D.Mont.1997), United States District Judge Charles C. Lovell determined that Mont.Code Ann. § 13–35–233 is unconstitutional and further permanently enjoined the class of county attorneys in the State of Montana and Ed Argenbright, Commissioner of Political Practices for the State of Montana, from enforcing it. The Court concurs in Judge Lovell's analysis and likewise declares Mont.Code Ann. § 13–35–233 unconstitutional.

### 3.   *Mont.Code Ann. § 13–37–131*

■ **13–37–131. Misrepresentation of voting record—political civil libel.** (1) It is unlawful for a person to willfully or negligently make or publish a false statement about a candidate's public voting record or to make or publish a false statement that reflects unfavorably upon a candidate's character or morality.

(2) It is unlawful for a person to willfully or negligently provide false information to a candidate concerning another candidate's public voting record when the person knows or should know that the information will be made public during the course of a campaign.

(3) For the purposes of this section, the public voting record of a candidate who was previously a member of the legislature includes a vote of that candidate recorded in committee minutes or in journals of the senate or the house of representatives. Failure of a person to verify a public voting record is evidence of the person's willful or negligent conduct if the statement made by the person or the information provided to the candidate is false.

(4) A person violating subsection (1) or (2) is liable in a civil action brought by the commissioner or county attorney pursuant to 13–37–124 for an amount up to $1,000. An action pursuant to this section is subject to the provisions of 13–37–129 and 13–37–130.

1384

Plaintiffs argue that subsection (2) and the first clause of subsection (1) are unconstitutional because they apply an impermissibly low standard of negligence in prohibiting false statements and information.

Plaintiffs argue that the second clause of subsection (1) is unconstitutional because it imposes a strict liability standard and it proscribes statements concerning a candidate's character which are not susceptible of being proven true or false.

Plaintiffs derive their argument from the libel case of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) in which the Supreme Court held that a public official may not recover "damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is with the knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–280.

Defendants first argue that because this is not a case involving libel, traditional concepts relating to libel cases do not apply. The court notes with some interest, however, that defendants then quote from a United Supreme Court case involving libel, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and argue that false statements of fact are not entitled to constitutional protection. Finally, defendants argue that the statute is narrowly tailored because it does not prohibit speech, but simply authorizes a penalty for "negligent false speech."

With respect to defendants' first contention, the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. at 277 noted that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel." Consequently, the focus should not be upon the type of offending law, *i.e.*, civil defamation laws or criminal statutes, but instead upon whether in fact the state is infringing upon rights secured by First Amendment.

■ When a law burdens core political speech the court must apply the exacting scrutiny test, and uphold the restriction only if it is narrowly tailored to serve an overriding state interest. *First National Bank*

*of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). While the defendants quote *Gertz, supra*, they do not quote enough of the opinion to reveal the Court's holding. The remainder is quoted below:

Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate. As James Madison pointed out in the Report on the Virginia Resolutions of 1798: "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." [citation omitted] And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties. As the Court stated in *New York Times Co. v. Sullivan, supra*, at 279: "Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred." The First Amendment requires that we protect some falsehood in order to protect speech that matters.

*Gertz*, 418 U.S. at 340–341.

The First Amendment is the pillar "of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. A law which requires a critic of a candidate for office to guarantee the truth of all of his or her factual assertions, under the penalty of criminal prosecution or imposition of civil liability, leads to self-censorship. *See; Sullivan*, 376 U.S. at 279. As further recognized by the *Sullivan* Court:

Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 'steer far wider of the unlawful zone.' [citation omitted] The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.

*Sullivan,* 376 U.S. at 279.

Core political speech, that which Mont. Code Ann. § 13–37–131 attempts to regulate, "occupies the highest, most protected position" in the "rough hierarchy in the constitutional protection of speech." *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 422, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). In its current form Mont.Code Ann. § 13–37–131 offends the First and Fourteenth Amendments to the United States Constitution because it will inevitably lead to self-censorship.

The offending portions of the statute, struck out below, are declared unconstitutional:

**13–37–131. Misrepresentation of voting record—political civil libel.** (1) It is unlawful for a person to willfully ~~or negligently~~ make or publish a false statement about a candidate's public voting record ~~or to make or publish a false statement that reflects unfavorably upon a candidate's character or morality.~~

(2) It is unlawful for a person to willfully ~~or negligently~~ provide false information to a candidate concerning another candidate's public voting record when the person knows or should know that the information will be made public during the course of a campaign.

*4.   Mont.Code Ann. §§ 13–37–216(1)(a)*

**13–37–216. Limitations on contributions.** (1)(a) Aggregate contributions for each election in a campaign by a political committee or by an individual, other than the candidate, to a candidate are limited as follows:

(i) for candidates filed jointly for the office of governor and lieutenant governor, not to exceed $400;

(ii) for a candidate to be elected for state office in a statewide election, other than the candidates for governor and lieutenant governor, not to exceed $200;

(iii) for a candidate for any other public office, not to exceed $100.

In *Buckley v. Valeo, supra,* the United States Supreme Court upheld a federal statute that prohibited an individual from contributing more than $1,000 to any single candidate. The Court reasoned as follows:

The Act's $1,000 contribution limitation focuses precisely on the problem of large campaign contributions—the narrow aspect of political association where the actuality and potential for corruption have been identified—while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources. Significantly, the Act's contribution limitations in themselves do not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties.

We find that, under the rigorous standard of review established by our prior decisions, the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling.

*Buckley,* 424 U.S. at 28–29.

Plaintiffs cite the court to *Carver v. Nixon,* 72 F.3d 633 (8th Cir.1995), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996), in which the Eighth Circuit determined that contribution limits of $100, $200, and $300 were a "difference in kind from the limits in *Buckley*" and "not closely drawn to reduce corruption or the appearance of corruption associated with large campaign contributions." *Carver v. Nixon,* 72 F.3d at 644. The *Carver* reasoning, and plaintiffs' argument, is as follows. *Buckley* only prohibits "large" contributions with the potential to

corrupt the process. *Buckley* determined that a $1,000 contribution is not large. Thus, anything under $1,000 cannot be considered a large campaign contribution, particularly today, over 20 years after *Buckley.*

The defendants cite the court to *Russell v. Burris,* 978 F.Supp. 1211 (E.D.Ark.1997) in which the court determined whether particular contributions were "large" in the context of Arkansas elections. In *Russell* the court determined that a $100 contribution limit for non-statewide elections was constitutional and a $300 contribution limit for statewide races was unconstitutional.

As demonstrated by the *Russell* decision, a determination of what constitutes a "large" contribution associated with campaign corruption or the appearance of corruption is based upon the particular facts and circumstances of the campaign at issue. Defendants argue that in 1992 the average campaign costs for a Montana State Senate seat were $6,139 and for a Montana State House seat $3,807, far less than the average campaign costs considered in *Russell.* Defendants contend summary judgment is inappropriate to resolve this particular issue because the facts need to be developed at trial. This court agrees.

5. *Mont.Code Ann. § 13–37–218*

**13–37–218. Limitations on receipts from political committees.** A candidate for the state senate may receive no more than [$1,850] in total combined monetary contributions from all political committees contributing to his campaign, and a candidate for the state house of representatives may receive no more than [$1,100] in total combined monetary contributions from all political committees contributing to his campaign. . . .

Defendants first contend plaintiffs lack standing to challenge this particular statute because they have not been nor do they allege that any of them will be a candidate for office.

■ Article III of the Constitution limits federal jurisdiction to cases or controversies of which standing is a core component. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Standing requires that a plaintiff establish:

(1) actual or imminent, concrete injury in fact, (2) causal connection between the alleged injury and the conduct complained of, and (3) it is likely that a favorable decision will redress plaintiff's injury. *Id.* Because contributors are also injured by measures which prohibit candidates from accepting contributions, contributors have standing to challenge such measures. *See Buckley v. Valeo,* 424 U.S. at 22; *Service Employees International Union v. Fair Political Practices Commission,* 955 F.2d 1312, 1316 (9th Cir.), *cert. denied,* 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992); *Vannatta v. Keisling,* 899 F.Supp. 488, 493–494 (D.Or. 1995).

■ However, the case or controversy requirement also bars the court from reaching matters before they are ripe. "While standing is primarily concerned with who is a proper party to litigate a particular matter, ripeness addresses when that litigation may occur." *Lee v. State of Oregon,* 107 F.3d 1382, 1387 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 328, 139 L.Ed.2d 254 (1997). The ripeness doctrine prevents "the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Federal courts normally ought not resolve issues involving contingent future events that may not occur as anticipated or that may not occur at all. *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580–581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). Ripeness requires the court to evaluate (1) whether the issues are fit for judicial decision and (2) whether the parties will suffer hardship if the court declines to consider the issues. *Abbott Laboratories,* 387 U.S. at 149.

■ In its statement of uncontroverted facts Montana Right to Life Political Action Committee claims that it "may be prohibited from making any contributions to candidates for state senate and state house of representatives if candidates for these offices have already received $1100 or $1850 from other political committees." (emphasis original). While MRLPAC italicized "any" and "other," "may" and "if" are the key words in the

above-quoted sentence. Because the existence of any dispute in this case hangs on future contingencies that may or may not occur, this particular issue is not ripe for review. The dispute regarding Mont.Code Ann. § 13–37–218 has not matured sufficiently to warrant judicial intervention.

### 6. Mont.Code Ann. § 13–35–236

■ **13–35–236. Prohibited contributions for ballot issues.** (1) A business corporation, nonprofit corporation, religious corporation, professional corporation, business trust, limited liability company, close corporation, partnership, limited partnership, mining partnership, cooperative association, agricultural association, cooperative agricultural marketing association, rural cooperative, utility association, or other association or organization exempt from taxation under 15–31–102 or 26 U.S.C. 501(c) may not make a contribution or an expenditure in connection with a ballot issue or to a political committee that supports or opposes a ballot issue.

(2) A person or political committee may not accept or receive a contribution described in subsection (1).

(3) This section does not prohibit the establishment or administration of a separate, segregated fund to be used for making political contributions or expenditures if the fund consists only of voluntary contributions solicited from individuals who are shareholders, employees, or members of an organization described in subsection (1).

(4) A person who violates this section is subject to the civil penalty provided in 13–37–128.

Plaintiffs argue that to the extent this statute prohibits corporate advocacy of ballot issues it is unconstitutional. They rely upon *Buckley,* as discussed in section 1 above, and *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), in which the Supreme Court found unconstitutional a Massachusetts criminal statute that forbade certain expenditures by banks and business corporations for the purpose of influencing the vote on referendum proposals. The Court reasoned:

> Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections, [citations omitted], simply is not present in a popular vote on a public issue. [footnote omitted] To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution 'protects expression which is eloquent no less than that which is unconvincing.' [citations omitted] We noted only recently that 'the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of other is wholly foreign to the First Amendment ...' [citations omitted] Moreover, the people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. [footnote omitted] They may consider, in making their judgment, the source and credibility of the advocate. [footnote omitted] But if there be any danger that the people cannot evaluate the information and arguments advanced by the [corporations], it was a danger contemplated by the Framers of the First Amendment.

*Bellotti,* 435 U.S. at 790–792.

In response defendants argue that *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), governs and renders the above-quoted statute constitutional. In *Austin* the Supreme Court held constitutional a state statute that prohibited corporations from using general treasury funds for independent expenditures in connection with state candidate elections. *Austin,* however, is distinguishable from *Bellotti* because in *Austin* the challenged state statute prohibited corporations from making independent expenditures on behalf of candidates, not ballot issues. As noted in *Bellotti,* "[t]he risk of corruption perceived in cases involving candidate elections, [citations omitted], simply is not present in a popular vote on a public issue." *Bellotti,* 435 U.S. at 791. The Court also determined that the Michigan Chamber of Commerce, a nonprofit corporation, did not exhibit the characteristics identified in *Massachusetts Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539, that would require the state to exempt it from a

generally applicable restriction on independent corporate expenditures. This Court has already determined that Montana Right to Life exhibits the characteristics identified in *Massachusetts Citizens for Life* and is exempt from the restriction on independent corporate expenditures. For the same reasons the state also may not restrict Montana Right to Life's ability to make independent corporate expenditures on ballot issues. Mont.Code Ann. § 13–35–236 is unconstitutional as applied to Montana Right to Life Association.

Based upon the foregoing, **IT IS HEREBY ORDERED** that plaintiffs' motion for summary judgment is granted in part and denied in part as follows:

1. Mont.Code Ann. § 13–35–227 is declared unconstitutional as applied to plaintiff Montana Right to Life Association. Defendants, their agents and successors, are permanently enjoined from enforcing Mont.Code Ann. § 13–35–227 against Montana Right to Life Association.

2. Mont.Code Ann. § 13–35–233 is declared unconstitutional on its face. Defendants, their agents and successors, are permanently enjoined from enforcing Mont.Code Ann. § 13–35–233.

3. The offending portions of Mont.Code Ann. § 13–37–131, struck out below, are declared unconstitutional:

> **13–37–131. Misrepresentation of voting record—political civil libel.** (1) It is unlawful for a person to willfully ~~or negligently~~ make or publish a false statement about a candidate's public voting record ~~or to make or publish a false statement that reflects unfavorably upon a candidate's character or morality.~~
>
> (2) It is unlawful for a person to willfully ~~or negligently~~ provide false information to a candidate concerning another candidate's public voting record when the person knows or should know that the information will be made public during the course of a campaign.

Defendants, their agents and successors, are permanently enjoined from enforcing the portions of Mont.Code Ann. § 13–37–131 struck out by the court.

4. Genuine issues of material fact preclude the court from rendering summary judgment on plaintiffs' claim relating to Mont.Code Ann. § 13–37–216.

5. Plaintiffs' claim relating to Mont.Code Ann. § 13–37–218 is not ripe for review and is hereby dismissed without prejudice.

6. Mont.Code Ann. § 13–35–236 is declared unconstitutional as applied to plaintiff Montana Right to Life Association. Defendants, their agents and successors, are permanently enjoined from enforcing Mont.Code Ann. § 13–35–236 against Montana Right to Life Association.

The Clerk shall forthwith notify the parties of the making of this Order.